**Fradus Lee ANDERSON, Plaintiff,**

**v.**

**UNIVERSITY OF WISCONSIN, University of Wisconsin Law School, Gerald J. Thain, John A. Kidwell, June Weisberger, Stuart Erlanger, Stephen J. Herzberg, Charles Irish, W. Lawrence Church and Bernard C. Cohen, Defendants.**

No. 86–C–635–S.

United States District Court,
W.D. Wisconsin.

Aug. 11, 1987.

---

Steven J. Schaefer, of Fox, Fox, Schaefer & Gingras, Madison, Wis., for plaintiff.

Robert D. Repasky, Asst. Atty. Gen., Madison, Wis., for defendants.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Plaintiff Fradus Lee Anderson has brought handicap and race discrimination claims against the defendants. Plaintiff contends that the defendants discriminated against him on the basis of handicap and race when they denied his request to be readmitted to the University of Wisconsin Law School. Defendants moved for summary judgment. On July 2, 1987, the Court granted the defendants' motion for summary judgment. At that time, the Court ordered the Clerk to withhold entry of judgment until the Court issued an extensive memorandum setting forth the Court's reasons for granting defendants' motion. This memorandum sets forth those reasons for granting defendants' summary judgment motion.

The Supreme Court established the standard for granting a summary judgment motion in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The Court stated

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

### FACTS

Plaintiff Fradus Lee Anderson is an adult black male. On or about June 7, 1979, the Admissions Committee of the University of Wisconsin Law School voted to accept Anderson as a law student for the class of August 1979. Anderson was accepted as an LEO student. The LEO student program is a special program for minority students which provides financial and other assistance for minority students. There is a limited enrollment in the LEO program.

Anderson began law school the first semester of the 1979–80 school year. Anderson attained a 75 average for that semester. Anderson began the second semester of 1979–80, but was declared ineligible when the law school determined that it had not received the necessary certification of Anderson's undergraduate degree. Anderson subsequently provided the neces-

sary certification, but did not resume the second semester of the 1979–80 law school year.

On October 10, 1980, Anderson wrote to Dean Helstad about reentering law school for the second semester of the 1980–81 year. In the letter to Helstad, Anderson asserted that he had a problem with alcohol and that he was initiating a program of treatment, including the taking of the drug Antabuse for alcoholism control. Dean Helstad was of the view that Anderson had a right to enter the second semester and complete a full year of law school.

Anderson enrolled in the second semester of the 1980–81 law school year. During this semester Anderson made telephone calls to E.L., his female legal writing partner. Anderson telephoned E.L. on Tuesday, March 17, 1981, at approximately 1:15 A.M. and was apparently drunk at the time. Anderson began the conversation talking about the "C" grade that he received on one legal writing task, and stated "I don't care if I got a C, because I got you." E.L. stated that Anderson's conversation was rambling, and that at one point he said, "I've got the money from the guy so that we can go to Jamaica." According to E.L., Anderson further stated that he thought she was "sexy" and that he was "in love with her." Anderson telephoned E.L. two days later on March 18, 1981 and apologized for this behavior. On April 12, 1981, Anderson called E.L. and said, "You did this, you caused this you damn bitch." E.L. perceived the calls to be threatening and she complained to the Law School about Anderson.

In May 1981, Anderson asked permission to drop two of the second semester courses that he was taking. The Law School did not permit the selective dropping of first year classes, and Anderson's request was denied. He was advised that it would be permissible for him to drop the full semester. Anderson asked to withdraw from all of the second semester courses by a letter dated May 5, 1981. His request was granted, but it was not possible to drop the Legal Writing course, and a grade of D was recorded.

On January 4, 1982, Anderson requested permission to enter the second semester of the 1981–82 school year. In a letter to Dean Helstad, Anderson asserted that he planned to attend classes regularly and do well as it was "important" that he be a lawyer, and important that he "not betray the faith and trust of those who have given" him a "chance." Anderson enrolled in and completed the second semester of Law School in 1981–82.

Anderson completed his first year of Law School with a 76.92 average. On or about August 24, 1982 Anderson was informed by Joan Rundle, Assistant Dean of the Law School, that his cumulative grade point average for his first year in Law School was 76.92, and below the 77.00 average that is necessary for retention in law school. Rundle further informed Anderson at that time that he could not continue in law school unless he received permission to do so from the Retentions Committee. Rundle also informed Anderson that if he wished to petition the Retentions Committee he should submit his request to the Committee immediately, and that it should be submitted to Professor Gerald Thain, Chair of the Committee.

In late August or early September of 1982, Anderson submitted a petition for permission to continue as a law student to the Retentions Committee. In his petition Anderson argued that he should be permitted to continue for the following reasons:

1. That if his summer session work was included, his weighted average would rise above the required 77.00 level;

2. That there was an improvement in his second semester grades as compared to his first semester grades; and

3. That he had been plagued by a very severe personal problem for the past half-decade plus, and that he had embarked upon a program that had not only helped him resolve the aforementioned personal problem, but would prove beneficial in many other areas of his life. (Details upon request).

On or about September 1, 1982, the members of the Retentions Committee were informed that Anderson had received an unrecorded grade of 80 in his Constitutional Law I Course during the summer session of 1982. This grade would have raised Anderson's cumulative average of 76.92 above the required level of 77.

On or about September 3, 1982, Thain requested Anderson to supply the Committee with further information regarding his petition. In writing, Anderson provided the Retentions Committee with the following information:

> To explicate the nature of my personal problem: I am an alcoholic. I was reluctant to be more specific in the petition because I do not feel that I can adequately convey my feelings.
>
> I was an active alcoholic when I entered Law School in 1979. I have been battling the disease since that time. I have tried various programs and none has been particularly helpful: One program felt that I have not suffered sufficiently to be properly motivated to recover; one program attempted to exercise the cause of my drinking through psycho-drama and other techniques and failed; and yet another where I was the only participant with a drinking problem applied transactional analysis in a group of individuals with severe emotional problems. However, each step brought me closer to grips with my problem, made me more aware of my predicament.
>
> The first and most difficult problem for any alcoholic is denial: Invariably, a drinking alcoholic will deny—at least, inwardly—that he has a problem. I have overcome this hurdle, and I believe, at last, am on my way to recovery. As of now, I am a member of Alcoholics Anonymous, and consider myself a recovering alcoholic.
>
> In my petition, I stated that my "personal problem" had stood in the way of my successfully completing Law School, and that I feel this obstacle has been removed. I do claim to have stopped drinking forever, but, taking one step at a time, I have stopped. Today, I have a sponsor, someone to guide me to sobriety and sanity, I attend meetings daily, I am surrounded by people who understand and give me support.
>
> If you allow me to continue, I believe that I will be an excellent student.

On or about September 14, 1982, the Retentions Committee informed Anderson that the Committee had rejected his petition to continue in Law School by a vote of 5 to 0. The Committee voted to deny Anderson's petition for the following reasons:

> You have stated both in writing and at the Committee's meeting with you on September 9, 1982, that alcoholism is the basic cause of your inability to perform at a satisfactory academic level as well as the underlying cause for your inability at times to take examinations when scheduled, the cause of your inability to carry to successful completion a full academic load for a normal semester since you first enrolled in Law School three years ago, the cause for frequent absence from classes, and the cause for your recurrent dropping of Law School courses.
>
> You have informed the Committee that you believe that you have the problem of alcoholism under control; yet, you have further advised it that you returned to serious rehabilitation efforts under the auspices of AA, only at the end of August, 1982, and moreover, that your alcoholism prevented you from taking courses in which you had enrolled during the Law Schools Second Five Week Summer Session in July and August of 1982. In short, you have yet to demonstrate significant progress towards overcoming the grave disabilities imposed on your academic performance by alcoholism and therefore you are unable to give the Committee the necessary assurances that, were you retained, you could perform as a regular functioning member of the Law School class, able to take normal academic loads and complete them satisfactorily within the usual time.
>
> The Committee recognizes that alcoholism is a disease which, with significant effort and appropriate support, can be

overcome. Our action denying your petition is taken without prejudice to your right, at some appropriate future time to seek reentry to the Law School on a showing of such sufficient progress toward overcoming your alcoholism as to make your retention an act based on logical expectations formed from a consistent pattern of conduct rather than an act of blind faith that you suddenly will be able to overcome this serious and difficult problem. At this time, the Committee lacks sufficient evidence from which to conclude that you are either rehabilitated or making such progress toward rehabilitation that the risks of retention are justified.

The Committee believes that it is in your best interest first to attempt the not insubstantial task of making significant progress toward overcoming your alcoholism and the behavioral problems related to it, and then to address the question of continuing your law studies.

After having received the Retentions Committee's letter rejecting his petition, Anderson joined a Chemical Abuse Treatment Program at Dane County Mental Health in early October of 1982.

On or about January 13, 1983, Anderson again filed a petition for permission to continue with the Retentions Committee. In his petition, Anderson stated that his petition should be granted for the following reasons:

The Committee posed the challenge that I should demonstrate sufficient progress towards overcoming my alcoholism so as to make any retention an act based on logical expectations.

I believe that I have met the challenge and satisfied its demands: I have attended AA on a regular basis since August, 1982 since it is a "Anonymous" program, I could not count on the organization to document my progress, so subsequently, I joined the Dane County Mental Health Drug and Alcohol Unit; I have attended group and individual sessions on a frequent basis, (a letter is attached).

These steps I have taken are only one aspect of the deep, personal commitment

I have made not only to overcome my alcoholism but to become the best lawyer I can be.

With these steps and this commitment in mind, I respectfully petition the Retentions Committee to retain me for the second semester, 1982–83.

In support of Anderson's petition, Jane Whitaker, a Chemical Abuse Specialist with Dane County Mental Health, wrote a letter to Thain dated January 12, 1983, which stated as follows:

Lee Anderson has been a client in our out-patient alcohol and other drug treatment programs since September, 1982. He has participated in individual and group counseling and reports that he also attends Alcoholics Anonymous. He is working to maintain abstinence from alcohol and has been successful by his report with one exception.

On or about January 21, 1983, Thain informed Anderson that the Retentions Committee had received and reviewed his petition dated January 13, 1983 and had determined that his petition would be denied because it is premature. As a basis for its decision, the Committee relied upon the following reasons:

As you note in your petition, the Committee earlier stated to you that, as a prerequisite to retention, you would need to furnish sufficient documentation to demonstrate that you had overcome the alcoholism which was a major cause of your academic difficulties during the period of time that you were a law student. The Committee believes that it is too soon to determine if you have successfully accomplished this task. Alcoholism is a serious condition; only time can tell if it is solved. As a rule of thumb, we would anticipate that a period of one year would be a more reasonable time in which to have a sufficient basis to judge the nature and extent of your rehabilitation.

Moreover, the Committee believes that the documentation you have submitted is insufficient. It consists of information indicating that you have been engaged in an outpatient treatment program for the

last four months and that you have informed the program that you have also been attending Alcoholics Anonymous and that you have been successful in abstaining from alcohol "with one exception" by your own report. Stronger and more extensive evidence is required to support your petition. In any event, the period of time since our prior decision is too short for us to make an informed judgment on your progress.

The Committee will be willing to consider a petition from you prior to the first semester of the 1983–1984 academic year, but such a petition would require stronger documentation than that provided in your petition of January 13, 1983.

On or about August 2, 1983, the Retentions Committee received a letter from Tim Otis, Program Director for the Alcohol and Drug Treatment Program at Dane County Mental Health Center, which stated as follows:

Lee Anderson is actively involved in our Alcohol and Drug Treatment Program. He is participating in both individual and group work and is maintaining total abstinence from alcohol.

On or about August 7, 1983, Anderson again submitted a petition for permission to continue as a law student with the Retentions Committee. In his petition, Anderson provided the following reasons in support of his petition:

My original petition was denied September, 1982. At that time, you informed me that the reason for the denial was due to lack of sufficient evidence that I had overcome my alcoholism or shown adequate progress towards recovery in order to warrant belief that I would prove a successful law student.

During the past year, I have met weekly with a counselor on a one-on-one basis, met weekly in a group setting with other alcohol abusers lead by a team of treatment specialists, continued to attend AA meetings and initiated an Antabuse Program under the supervision of a medical doctor. (Antabuse is a drug that when ingested over a period of time on a con-

tinuing basis creates a violent physical reaction if alcohol is consumed.)

It is my belief that I have made significant progress towards recovery. I further believe that I will make a diligent law student despite my earlier set backs since I am sustained by desire, drive, and intelligence.

Last but not least, a personal pressure has been lifted with the passing of my father last November.

The Committee requested Anderson to provide further information in support of his petition. Anderson submitted a letter asserting (1) that he had been attending regular counseling and therapy sessions; (2) that he was employed as a part-time law clerk for a Watertown attorney; and (3) that he had taken courses in the Business School and stated that the grades were an A/B, B/C, C and C. The A/B was received in a Business Law course titled "Legal Aspects of Business Administration." One of the grades represented to be a C was actually a D. Anderson's grades in the Business School averaged at a two point, or a C, average. Anderson provided these Business School grades to the Retentions Committee as proof that he could do satisfactory work in law school.

In addition, the Retentions Committee received a letter from Tim Otis, on or about August 8, 1983, which stated as follows:

Lee Anderson has been an active client in our Alcohol Treatment Program for over a year. During that time he has actively participated in individual and group counseling. He has evidenced quite a bit of growth during this period and currently is well equipped to maintain sobriety. He is voluntarily using Antabuse to help maintain his abstinence from alcohol. I do not think that a return to full-time academic studies will present a threat to his continued sobriety.

On or about August 23, 1983, Howard Erlanger, as a member of the Retentions Committee, contacted Otis by telephone and discussed Anderson with Otis. During his conversation with Erlanger, Erlanger thought Otis provided him with the following information:

1. That Anderson had been completely sober for two and a half months with other "fits" of sobriety over the past year sometimes as long as three to four months;

2. That he thought Anderson could maintain his sobriety but he would be in a better position to know in six months;

3. That Anderson was less likely to break down and drink again and was dealing better with the issues regarding any potential return to drink;

4. That if Anderson maintained his sobriety, they would see a different person; and

5. A case could be made for admission or for waiting; and that slips are not uncommon in alcohol rehabilitation.

Erlanger also checked on Anderson's Business School grades and found that the grade stated as a C for Financial and Administrative Accounting was in fact a D. Erlanger reported to the Committee in writing his inquiries on the Business School grades and his findings from the telephone conversation with Otis.

The Retentions Committee considered Anderson's rehabilitation and Anderson's Business School grades when examining his petition to be retained. The Retentions Committee rejected the petition on August 29, 1983. Thain as Chairman of the Retentions Committee informed Anderson that the Retentions Committee had voted unanimously to deny his petition to reenter Law School. In support of the Committee's decision, Thain informed Anderson of the following:

Although we recognize that you appear to have made progress in overcoming your alcoholism problem, we do not feel that you have demonstrated by clear and convincing evidence that your recovery will enable you to undertake the sustained and intensive work necessary to complete a legal education.

In the past when we have denied your request to be allowed to reenter, we have encouraged you to seek permission at a later date if you made progress in controlling your alcoholism. Now we have sadly concluded that your progress is so slow and so much time has elapsed since you entered that we cannot entertain any more petitions to reenter.

On or about August 30, 1983, Anderson wrote the Retentions Committee and stated that he felt a mistake had been made and requested a reconsideration of his petition to continue as a law student.

On or about September 1, 1983, an attorney for Anderson, David R. Sparer, requested in a letter to Thain that the Retentions Committee grant Anderson a hearing on his petition. In his letter to Thain, Sparer indicated that he believed there had been significant miscommunication of information between the Committee and Anderson's alcohol counselor and that a correction of this information may make a big difference to the Committee. On or about September 8, 1983, Thain requested Sparer to state more precisely what he meant by "significant miscommunication of information" that he believed existed between the Committee and Mr. Anderson's alcoholism counselor; the nature of the "significant amount of new evidence" he believed he could present to the Committee; and the reasons why he believed Anderson could be expected to achieve academic success in Law School.

On or about September 8, 1983, Sparer provided Thain with the following statements:

1. Regarding Tim Otis, Mr. Anderson's alcoholic treatment counselor at Dane County Mental Health:

It appears that the Committee felt that Mr. Anderson had been sober only for the last three months, based on this, the Committee felt his progress was too slow and not sufficient to suggest that future sobriety could be expected with any assurance. Mr. Otis tells me that in fact Mr. Anderson has been sober more like nine months, but has had two or three isolated episodes of drinking. Thus continuous sobriety has only been for three months. Neither episode involved any period of drunkenness. Furthermore, Mr. Otis stated that without question, in the recovery period, a few false starts are to be expected. Thus, the evidence,

rather than slow and unsatisfactory recovery, instead is quite positive according to Otis.

Mr. Otis has stated that since your Committee believed that Mr. Anderson was not prepared to return to Law School, he wishes to appear at the upcoming hearing and testify. He has a lot to say about why he is *sure* that Mr. Anderson is now prepared to return to his studies. I, of course, should not try to paraphrase his statements. I urge you to give Mr. Otis the chance to speak to the Committee. He is the Director of the Drug and Alcohol Treatment Unit and has been working in this field for 13 years. He has worked with many people in high stressed professions, such as law or law school. He says he is ready to appear and speak to you at *any time and place.* It is my belief that if a qualified professional who is obviously very busy expresses this kind of interest in making a personal appearance to correct what he believes must have been a misinterpretation of his statements, that it would be extremely unfair to fail to provide such an opportunity.

2. Regarding Mr. Anderson's ability to do the academic work:

First of all, let me state that it was only yesterday that I was informed that this was even an issue. The Committee's prior decisions, as expressed in writing, appear to make it clear that the Committee felt that Mr. Anderson had the necessary ability, except that his drinking prevented him from performing to the level of his abilities. I have been prepared to show that Mr. Anderson has his alcoholism under control. At present, alcoholism will pose no problem in the performance of academic studies. Until yesterday, both Mr. Anderson and I believed that the Committee had no doubt of Mr. Anderson's ability once his alcoholism was not an obstacle to his studies. For this reason, I sincerely hope that the Committee will not rely heavily on the following short statement on the subject but rather view it as prima facie evidence sufficient to justify the granting of a hearing.

I do believe that there is no question that Mr. Anderson can perform the necessary academic work. One reason is that his academic and test scores were sufficient to cause him to be admitted to Law School. Secondly, during the time that he was in Law School, although his drinking significantly diminished his performance he was able to get a 76.9 average. At this time, free from the serious impairment of frequent drunkenness, his scores could only be better and even an increase as little as one point would meet the requirement and bring his overall average to an acceptable level. Third, over the spring and summer this year, Mr. Anderson took several classes mainly in the Business School. He got a B–C in Calculus, a C in Graduate Level Corporate Finance, and *A–B in Business Law,* and C's in Statistics and Administrative and Financial Accounting. Finally, and very important, it is that he really wants to do well. His enthusiasm and desire to succeed will do a lot to help him perform satisfactorily. Over the last year he has been working hard to get his life together. He is now ready to show himself to be successful in Law School and as a lawyer. His counselor has tremendous faith in him. I do as well.

On or about September 19, 1983, a meeting was held before the Retentions Committee concerning the reconsideration of Anderson's petition to continue in the Law School. The following persons spoke on Anderson's behalf at the meeting of September 19, 1983: Tim Otis; William Platz, Attorney at Law; Carolyn DeJoie, Professor of Human Relations at University of Wisconsin-Madison; and David Sparer, Attorney at Law. Otis, Platz, DeJoie, and Sparer all spoke based upon their individual experiences with Anderson that they thought Anderson had exhibited sufficient progress in his recovery from alcoholism to succeed in Law School. Platz also said that he thought Anderson was sincere in his efforts to recover and was his sponsor in Alcoholics Anonymous. DeJoie said that Anderson deserved the chance to continue in Law School because she thought he had

the ability to be successful in Law School. Otis said at the meeting of the Retentions Committee that Anderson was sufficiently recovered so as to handle Law School and that Anderson was a recovering alcoholic. Otis also advised that Anderson had or was on Antabuse. In Otis' opinion, readmittance in the Law School would not affect Anderson's recovery.

In addition, the Retentions Committee considered and made inquiry about the alleged harassment of E.L. Anderson informed the Committee that this incident occurred because of his alcoholism.

On or about September 28, 1983, the Retentions Committee informed Anderson by letter that the Committee had voted unanimously to deny his petition for reconsideration of its prior denial of his petition to continue in Law School. In its letter, the Committee stated:

In reaching this conclusion, the Committee believed that you failed to demonstrate that an exception to the law school academic standards was indicated in your case. First, even assuming that all your academic difficulties stemmed from your alcoholism, the recent period of sobriety on which you rely does not constitute a sufficient showing of recovery from years of alcoholism. Given your conduct while you were enrolled in law school (the need to be escorted from a class you were attending while intoxicated, for example, and reports that other students felt threatened by your behavior, to the detriment of their own education), it seems obvious that more than the beginning efforts of rehabilitation are needed for you to carry your burden of showing you should be granted an exception to the Law School Rules.

Second, it has been four years since you began your law school education and there are serious questions in our minds, given this spread of time, whether you would be able to receive the intense, discrete experience needed for a law degree were you to continue in law school in a piecemeal manner now or at some future time.

Finally, your academic record as a special student in the Business School this summer provides the Committee with no evidence that you would be likely to meet the academic standards of law school. Your grades in the Business School were below the minimum level needed to be admitted to Graduate School in that field. Your cumulative grade point average for spring was 2.312 and for summer 2.00. A record of 3.00 or better is normally expected for one to be admitted to Graduate School in Business. You compiled this poor record even though you selected courses which were, in some part, repetitious of subjects you had earlier taken. For example, Business 709, in which you received an "AB" is a basic course to make up for Business Law, a course described by Dean James Blakely of the Business School as an undergraduate course dealing with contracts—a subject you had already taken in law school. Moreover, not all the courses you took in the Business School were graduate level courses; two were undergraduate courses, one of which was a sophomore standing class, not open to graduate students.

While your overall average of 76.9 is not far below the bare minimum required to continue in law school, your inability to attain that bare minimum, coupled with this summer's poor academic showing at the Business School, provides no basis for us to expect you to be successful in law school. When the Committee considered this factor, in addition to your failure to demonstrate sufficient recovery from alcoholism, it felt compelled to reject your petition.

During the fall semester of the 1983–84 school year, Anderson participated in a course entitled Law and Religion given by former President O'Neil. Anderson asserts that he scored an 82 in the course. However, the course record does not show a record for Anderson. The course was a two-credit seminar with 45 enrolled students. Four either dropped or withdrew. There were ten grades recorded for the course below 82, and three at 82.

On or about February 1, 1984, Anderson filed a grievance pursuant to Law School Rules 12.02, 12.03(1)(b), and 12.03(2)(c) against the Retentions Committee on the grounds that its decision denying his petition to continue in law school was based upon the fact that he was a recovering alcoholic and was therefore discriminatory on the basis of handicap. After filing his grievance, Anderson requested Professor Stuart Gullickson, the Associate Dean responsible for administration of his grievance, to provide information regarding the practices of the Retentions Committee.

On or about January 24, 1984, Gullickson provided the requested information to Anderson. Gullickson informed Anderson that 30 students had submitted petitions to the Committee between May 1, 1979 and September 30, 1983, and that 18 of those petitioners were permitted to continue. Of those petitioners permitted to continue, only two had a cumulative grade point average higher than Anderson's cumulative grade point average. Of the 12 petitioners who were not permitted to continue, only two of them had cumulative grade point averages higher than Anderson's cumulative grade point average. Finally, Gullickson informed Anderson that the Committee had never entertained any petitions based upon a physical impairment or alcoholism.

On or about February 22, 1984, Gullickson denied Anderson's grievance. In his decision Gullickson stated:

I conclude from my review that the Committee did not discriminate against you. You were given the same opportunity to meet this law school's academic standards as was given to persons without a handicap. You were not denied the privilege of continuing as a law student solely because of your alcoholism. Instead, your applications were declined because you failed to meet the academic standards of your program, and the Committee, after a full hearing in the latest matter, believed you were not likely to be successful in meeting them in the future. Your situation is not one in which, despite your alcoholic and recovering alcoholic condition, you met the requisite academic standard.

On or about March 28, 1984, Anderson appealed the decision of the Retentions Committee of September 28, 1983, to the Petitions Committee of the University of Wisconsin Law School. The Petitions Committee had jurisdiction to consider Anderson's appeal because the appeal was upon alleged discrimination based on handicap and race.

In his Notice of Appeal to the Petitions Committee, Anderson stated the following reasons and grounds for his appeal:

1. In refusing to admit him to the UW–Law School, the Retentions Committee had improperly and illegally discriminated against him on the basis on his prior or perceived handicap (i.e. Alcoholism).

2. He had been regularly been receiving counseling and treatment to assist him in overcoming his handicap and had rehabilitated himself so that his prior alcoholism would not interfere with his academic performance.

3. The Retentions Committee did not base its decision on any expert, therapeutic, or medical evidence regarding his handicap in originally denying his petition in August of 1983, and the Committee failed to consider such favorable evidence submitted to them at the September, 1983 reconsideration hearing.

4. The Retentions Committee improperly added other extraneous grounds for denying his petition on September 28, 1983, without previously advising him of those concerns and without giving him an opportunity to rebut those alleged facts.

5. For the period of May 1, 1979 to September 30, 1983, the Retentions Committee acted on twenty-seven (27) petitions to continue Law School from students dropped as a result of academic deficiency. The Committee granted permission to seventeen (17) of these petitioners and denied ten (10) petitioners. Of the students denied, all but one showed a cumulative grade point average less than his. His grade point average was 76.92. Of the petitioners granted

permission to continue, none but one showed a cumulative grade point average higher than his cumulative grade point average.

On or about April 30, 1984, Anderson submitted to the Petitions Committee a brief in support of his position which included a letter dated April 27, 1984, from his counselor Tim Otis of Dane County Mental Health Center. In his letter, Otis made the following statement:

I am writing this letter in reference to Lee Anderson and the alcohol treatment services he has received here during the past year. Mr. Anderson is currently maintaining abstinence from alcohol and other drugs and is progressing in his recovery from alcohol dependency.

Alcohol dependency is a complex behavioral-biological addictive disability that afflicts approximately ten percent of the adult population. There are actually many forms and patterns of alcohol dependency ranging from daily, chronic, out-of-control drinking to episodic binge drinking, that may occur only at specific times of stress, etc. The Common feature of all types of alcohol dependency is the inability of the person to control his/her drinking, even when there are many negative consequences. The development of addictive dependency may take many years to progress for a person. During that time, the person may go through periods of non-abusive use, thus making the progression of the disability and may have tried, unsuccessfully, to quit altogether a number of times. All of this makes the treatment of alcohol dependency a very complex and often lengthy task. The individual may not think that change is possible. There may be a strong denial or minimizing of the problem, and the person may strongly fear the loss of alcohol as a 'necessary' coping mechanism without being able to substitute positive alternatives. In treatment, the goals to provide information, support and pressure to assist the person in changing life patterns so that alcohol dependency is no longer an issue. During this process, which often takes years, the individual continues to progress to different levels of recovery. Interspersed in this recovery process there are often periods in which the person may use occasionally. These are not seen as instances of failure, but as part of the expected recurrence of the dependency symptoms during their overall course of the recovery period.

As long as Mr. Anderson continues his involvement and treatment, AA, and takes Antabuse (as he currently is), I would not expect his continuing recovery from alcohol dependency to be a factor in his ability to function in law school. While law school will certainly add stress which could negatively affect his recovery, he is at a point that he understands that issue and is prepared to maintain treatment involvement to minimize that possibility.

In his brief in support of his appeal to the Petitions Committee, Anderson informed the Committee of the following:

1. That he was a recovering alcoholic and that he had undertaken a course of treatment which included daily meetings in AA, weekly sessions with the treatment specialist and taking antabuse.

2. That his counselor, Tim Otis, maintained the position which he held before the Retentions Committee in August of 1983 which was that alcohol is no longer a factor in Anderson's ability to function as a law student. Anderson also informed the Committee that Otis was an expert in the treatment of alcoholism for over fifteen years and was the manager of the alcohol treatment unit where he was a client.

3. That his LATC score of over 600 was an indicator that he had the general ability to perform in law school.

4. That personnel connected with the operation of the Law School had repeatedly commended his professionalism, competence, and ability, as follows: Professor Kidwell expressed confidence that he could do well in law school at a time after he had already confessed privately that he had a problem with alcohol; Dean Helstad wrote that he could look forward to a successful future as an

attorney should he solve his problems; Dean Thompson stated that he thought Anderson's arguments in an earlier appeal impeccable; Associate Dean Gullickson commended him warmly for his professionalism when accepting the Notice of Appeal on March 28, 1984; Ms. Birchler, Legal Writing Head, stated that Anderson gave the finest presentation that she had witnessed in oral arguments before the Legal Writing Panel; Lewis Ritcherson, educator and attached to Chancellor Shain's office, Dr. Carolyn Djore, educator, professor, and psychotherapist, William Platz, attorney in private practice, Kristine Euclide, attorney in private practice, had all claimed that he was one of the most articulate, literate, capable persons they had met.

On or about May 3, 1984, Professor Charles Irish as a member of the Petitions Committee informed Anderson that the Petitions Committee perceived its role as akin to an appellate court in which the most favorable decision possible for Anderson was a remand to the Retentions Committee. In response to Irish's assertion, Anderson objected by way of a letter dated May 4, 1984, in which Anderson in part stated that the Committee had jurisdiction to consider his claim of discrimination on the basis of handicap and that the Committee may deny or grant the request for relief which he made in whole or in part.

Irish requested information about Anderson from various individuals at the Law School. On or about May 3, 1984, Kidwell, as a member of the Retentions Committee, responded to Irish's request by providing Irish and the Petitions Committee with the following information:

Mr. Anderson was in my Contracts I class in the fall of 1980. It was a large class and met in Room B–25, if I recall. Mr. Anderson sat in the front of the room. At the beginning of the semester he frequently volunteered in class; I was encouraged by this since it had been my experience that minority students often fail to participate in class discussions. My initial reaction to him was favorable—by that I mean his responses seemed appropriate and relevant. At some point in the semester, however, his class attendance became irregular, and when he was in class his contributions seemed undirected and sometimes quite unresponsive to the questions. It did not initially occur to me that he was suffering from alcoholism. I stopped calling on him, even when he raised his hand, because more often than not his remarks were not useful, but rather consisted of unresponsive rambles. I decided later that many of his classmates must have realized he was drinking heavily. I can say that he never disrupted the class, except to the extent that his questions and answers became distracting to the class. On at least one occasion I recall that he fell asleep in class.

It was not long after this that Mr. Anderson came to my office. He was in an extremely intoxicated state. His voice was slurred, and he was scarcely able to walk. He wanted to talk about his problems, but was not really in a condition to do so. I talked with him for a few minutes, but decided that any discussion at that point was useless. I told him that I thought that he must obviously know that his alcoholism would make it very difficult, if not impossible, for him to be successful in law school. I told him that if he wanted to talk with me when he was sober I was willing to do so. I also told him that he should not come to class in an intoxicated state. I took him down to the Associate Dean's office; Warren Lehman was then the associate dean.

My recollection is that shortly after this I was approached by Mr. Anderson in the hall on the second floor. He asked me if I thought he should come to class. I asked him if he had been drinking, and he said he had been. I told him that in that case he should not come to class. I may have asked him whether he was seeking professional treatment for his alcoholism.

He may or may not have attended further sessions of the class after that conversation. My recollection is that he did

not, but he certainly did not attend regularly in any event.

The next time that I remember talking with Mr. Anderson personally was in a meeting of the Retentions Committee in connection with one of his petitions to continue. The meeting was held in one of the interview rooms adjacent to the Placement Office. In the course of that meeting the committee raised the issue of nonacademic misconduct. Serious complaints about Mr. Anderson had been made by at least one student. We told Mr. Anderson that we were concerned about this, as well as about the likelihood that he would be able to successfully complete law school in light of his drinking problem. He told us that he was aware of the complaints concerning his behavior and that, first, some of his behavior had been misconstrued, and that, second, any misconduct was attributable to his alcoholism—from which he had recovered. Further questioning convinced the committee that although he might have begun to recover from his drinking problem, that by his own admission that recovery had been intermittent and was at that time incomplete.

My conversations with Mr. Anderson have always been cordial and he has always behaved in a courteous way.

On or about May 7, 1984, Thain, as a member of the Retentions Committee, responded by letter to Irish's request for information as follows:

My memory concerning this is that in its considerations of Mr. Anderson's petition, ultimately rejected by the Committee in the autumn of 1982, the Committee, in the course of its formal discussion of this matter with Mr. Anderson, had questions raised as to whether his alcoholism had affected his behavior in Law School classes or otherwise in Law School. At that time, it was noted both by Professor Kidwell, a member of the Committee, and Mr. Anderson, that Professor Kidwell had asked Mr. Anderson not to attend his classes in an alcoholic condition. Mr. Anderson's behavior in the classroom while not disruptive, was not that of a sober and rational student

and consequently, it was interfering with the proper functioning of the class. It was also stated that there was at least one student who believed herself to be personally threatened by Mr. Anderson. As I recall, Mr. Anderson stated that he believed his actions had been misinterpreted but to the degree that any of his actions may have been improper, they were caused by his alcoholism. The Committee proceeded to act on the assumption that the cause of any misconduct or perceived misconduct of Mr. Anderson's part was the consequence of his alcoholism.

On or about May 5, 1984, the Petitions Committee met to consider Anderson's appeal. At that meeting, the Petitions Committee decided that they would bring Anderson's appeal before the Committee again due to the following reasons:

1. The Retentions Committee had expressed concern about rehearing the case;

2. The University's attorney, Michael Liethen, had provided them with unclear information as to what constituted discrimination, and Anderson had asked for an early decision so that, if favorable, he could *enroll in summer school.*

In its meeting on May 15, 1984, the Petitions Committee accepted Anderson's contention and assumed for the purposes of their decision making that the Retentions Committee's decision was based on erroneous grounds without actually deciding whether it was or not. The Committee then brought this case before them again as a *de novo* review under Law School Rule 12.03. Prior to the meeting of May 15, 1984, the Petitions Committee had informed Anderson that the Committee would consider the entire Retentions Committee file as supplemented by information from the Business School concerning his course work in the Business School.

On or about June 5, 1984, Irish informed Anderson by letter that the Petitions Committee concluded that Anderson should not be readmitted to the Law School. In his letter, Irish stated in part:

The Petitions Committee has met twice to consider your claim that the decision of the Retentions Committee denying the opportunity to continue in Law School was improper. You have contended in making its decision the Retentions Committee discriminated against you on the basis of your handicap, alcoholism, and that such discrimination is in violation of federal, state and university legislation and policies. As explained below, it is the unanimous decision of the Petitions Committee that you should not be readmitted to Law School.

The Petitions Committee first met on Monday, May 7, 1984. All members of the Committee were present. You were also present, but only as nonparticipating observer. At the May 7, 1984, meeting, the Petitions Committee had before it submissions you had made, plus a memorandum from Professor John Kidwell dated May 3, 1984, and a letter from Professor Gerald Thain dated May 7, 1984. Because of the paucity of information on why the Retentions Committee denied you the opportunity to continue, the unanimous decision of the Petitions Committee was that we first should obtain an opinion from the Chancellor's legal counsel, Michael Liethen, on the extent to which the Retentions Committee's discretion was limited by the anti-discrimination legislation and policies. If Mr. Liethen were to conclude that the Retentions Committee does not have unfettered discretion, then we were to send your case back to the Retentions Committee with directions that they either decide the de novo, or else provide more detailed information on how they arrived at their decisions to deny you the opportunity to continue. Shortly after the May 7, 1984, meeting, Professor Herzberg talked with Mr. Liethen about your case. Mr. Liethen indicated that the standard applicable to the Retentions Committee decisions was unclear. At about the same time, you telephoned Professor Church and me and indicated that you would like to have the issue resolved quickly, so that if your decision was favorable, you would be able to enroll the summer session. At that time, I had conversations with several members of the Retentions Committee, and some of them expressed reservations about reviewing your case again.

As a result of the developments after the May 7, 1984, meeting, the Petitions Committee scheduled another meeting for May 15, 1984, at 9:00 a.m. to consider your case. Prior to that meeting, you were advised that the Petitions Committee probably would grant your request, contained in your letter of May 4, 1984, to the Committee, that we consider the case de novo rather than referring it back to the Retentions Committee. You were told that if we were to do this, our decision would be based on a review of your entire Retentions file, plus any submissions you wanted to make. You were also told that you could go through the entire file and make copies of anything contained in the file.

You did examine the file briefly on May 9, and at that time you were advised that a letter from the Business School concerning your performance in the several business courses you have taken would be included in the file we reviewed.

The Petitions Committee met as scheduled May 15 at 9:00 a.m. All members of the Committee were present. Initially, it was decided that as an accommodation to both the Retentions Committee and you, we would review your case de novo as we are permitted to do under Law School Rule 12.03(3). The standard of the review was the same as that employed by the Retentions Committee:

> Is there reason to believe that the petitioning student will succeed in law school, notwithstanding the student's failure to meet the minimum level of academic performance.

After closely reviewing your Retentions Committee file, we unanimously conclude that you should not be readmitted to law school. By your own admission, the courses you took in the Business School were taken during a period you were not suffering from the adverse affects of alcoholism. And yet, in those courses,

you received low grades, even though some of the courses were at an undergraduate level. You did receive one AB, but that was in a law related course, where we presume you had an advantage. Therefore, we find no reason to believe that you will succeed in law school. Our conclusion is similar to that of E.J. Blakely, Associate Dean of the School of Business. Dean Blakely reviewed your Business School record and said:

Our records do not indicate that Mr. Anderson has ever applied to the School of Business for graduate education. I do not know the character or quality of his undergraduate background, but based on grade performance on the five courses mentioned in the above paragraph, I would not consider his academic record to be at a level of achievement such that the Admissions Committee of our school would recommend admission.

Your below average performance in Professor O'Neal's course in *Religion and the Law.* in fall of 1983, did not demonstrate to us that you are likely to succeed in law school. Although you are not registered for the course, you did take the exam and received an 82. The average grade in the course was 84.05. However, here again, because you were taking only a single course in the Law School, presumably you had an advantage over the other students, and yet you still performed below the class average.

On or about June 5, 1984, Anderson submitted a written appeal to the Chancellor's Office for the University of Wisconsin regarding the Retentions Committee's denial of his petition to continue in Law School. In his appeal letter, Anderson gave six reasons why he considered that the Retentions Committee erred in following the Law Faculty's policies or procedures or that the Committee's decision was arbitrary. Anderson claimed that:

1. The Committee denied his application because of his conduct while enrolled in Law School but the Committee did not make him aware of such conduct until the last denial of the Committee.

2. The Committee erred in not accepting Otis' and Dejoie's statements that Anderson was recovered from alcohol.

3. The Committee's examination of his business school grades was an abuse of discretion because it was irrelevant to the issue of whether he could complete law school successfully.

4. The Committee erred in not giving more consideration to his grades and his steady pattern of improvement.

5. The Committee arbitrarily ignored Anderson's grief when his father died.

6. The Committee's decision ignores the policy of the University to aid minority and handicapped students.

Chancellor Shain asked Vice Chancellor for Academic Affairs, Bernard C. Cohen, to decide Anderson's appeal. Cohen met with Thain on September 4, 1984. On September 7, 1984, Thain directed a memo to the Retentions Committee, which documented his meeting with Cohen, as follows:

On September 5, 1984, I spent about 45 minutes talking to Vice Chancellor Bernie Cohen about this matter. The gist of Bernie's reaction was that although he was willing to accept Mike Liethen's advice to him that the file was legally sufficient to justify a denial of Anderson's appeal to the Chancellor (which had been referred by the Chancellor to Cohen for initial review) he felt the paper record was relatively weak and wanted to know what harm would come to the Law School by simply allowing Anderson to reenter. He also seemed to say that if the Law School were adamant in its position in not allowing Anderson to return, he would probably acquiesce. I advised him that the position of the Law School was that the record was sufficient to justify Anderson's dismissal from Law School and non-retention; therefore, we believed it would be a big mistake to allow Anderson to reenter Law School. Although there were a variety of reasons expressed by Cohen in support of his contention that the record was especially weak in this matter, his major argument seemed to be that in the initial fall of

1982 denial of retention to Anderson the Committee asserted that, assuming the basis of his problems was his alcoholism, he would have to demonstrate a period of sufficient rehabilitation to justify readmission to Law School. That posture was essentially reasserted in a January 1983 letter to Anderson, which stated that it was too soon to determine whether or not he was rehabilitated. Then, in the August 1983 denial of Anderson's petition by the Committee, it was stated, *inter alia*, that his progress toward rehabilitation had been so slow and so much time had passed that the Committee no longer believed it would be appropriate for him to attempt to reenter Law School as a continuing student. Bernie seemed to be taking the position that the Committee, having decided to rest its decision on the basis of Anderson's alcoholism (instead of Anderson being "dumb" as he put it) either should now accept Anderson's contention that he was now rehabilitated or make out a positive case that he was not and have that case made a record. He also seemed to interpret the Committee's letters to Anderson as, in effect, a guarantee that Anderson would be readmitted after sufficient time had passed to demonstrate rehabilitation and the statement in the final letter to him from the Retentions Committee— that his progress was so slow and the elapsed time so long that it was no longer appropriate for him to continue to seek reentry to Law School—to be kind of "Catch-22" for Anderson.

Although Bernie indicated that his decision on this matter would remain in abeyance for a few days, he subsequently raised the issue again in both telephone communications and personal conversation with Dean Thompson. Dean Thompson's reaction has been essentially the same as mine.

On September 14, 1984, Cohen requested the Law School to respond to Anderson's appeal. On October 1, 1984, Thain provided Cohen with the response which stated in part as follows:

The Committee did not discriminate against him (Anderson) by refusing to hear his personal claim. Indeed, the behavioral manifestations of alcoholism may be taken into account to determine whether someone is qualified. In this regard, the Retentions Committee, from the time of his first petition for readmission, discussed with him and wrote to him about his behavioral problems while in Law School, which were relevant both to note in the severity of his alcohol problem in regard to assessing his claims of cure, and in weighing the risk involved if he were to be readmitted.

On October 30, 1984, Anderson and his attorney presented oral argument to Cohen. Dean Clifford Thompson was present on behalf of the Law School. University counsel Michael Liethen was also present. Anderson's attorney informed Cohen that it appeared there existed a latent fear for alcoholism within the Law School and analogized that fear to epilepsy. Anderson's attorney proposed a compromise which would involve a probationary admittance for Anderson.

On or about January 11, 1985, Vice Chancellor Cohen informed Anderson by letter that he had sustained the Law School's decision. The letter stated as follows:

I am writing this letter to inform you of my decision on your appeal from the decision of the Law School denying your readmission.

I have concluded after long and careful deliberation that the Law School's decision should be sustained.

In my September 14, 1984, letter to you and to Dean Thompson, I stated that the issues raised by your appeal were (1) whether there was unlawful discrimination on the basis of handicap (alcoholism) in the decision not to readmit you to the Law School; and (2) whether the Law School unfairly changed its criteria for your readmission. At our meeting on October 30, 1984, in my office, you and your representative, Attorney Christine Euclide, agreed with my statement of the issues. Dean Thompson also agreed with this statement of the issues.

*Handicap discrimination.* There is no dispute that your performance prior to

your dismissal did not meet minimum academic standards in the Law School. You were dropped for that reason. Your claim is that you have not been readmitted because you are an alcoholic, and the Law School responds that you were not readmitted because you failed to convince the faculty committees hearing your appeals that an exception to the rules for continuation should be made in your case.

In support of your view, you point to references to your alcoholism in correspondence from the faculty committees. I do not find these references to be evidence that the Law School decisions were motivated by your alcoholism. I do find that the behavioral manifestations you claimed were the reason for your unsatisfactory academic performance were taken into consideration by the Law School in deciding whether you could successfully complete your course of studies and, therefore, whether an exception should be made in your case. The former would have been illegal; the latter is not.

You raised alcoholism as the explanation for your unsatisfactory academic performance and you argued that this disability was one you could overcome, at least to the extent that it would not be a bar to satisfactory academic performance. Having placed this issue before the Law School committees, it was appropriate for them to examine all of the available information, including your academic performance in other courses since your dismissal as well as your own representations about your progress in controlling your alcohol abuse, in reaching a considered judgment whether you would be able to perform satisfactorily if readmitted.

I understand you believe the Law School should have accepted your claim that you would perform satisfactorily if readmitted. However, questions of academic potential are what the faculty must resolve every day, and I will accept such judgments, unless I can be convinced that they have no reasonable basis. I am convinced, however, after reviewing your submissions and that of the Law School,

that there is a reasonable basis for the judgment which has been made in your case.

I therefore do not conclude that the Law School discriminated against you on the basis of alcoholism.

*Criteria for readmission.* In this portion of your appeal, you claim that the Law School first required only that you demonstrate a significant period of sobriety and, then, after you believed you had, the Law School based its decision not to readmit you on other factors about which you had never received notice.

After reviewing your submissions and that of the Law School, I am not persuaded by this characterization of events. Rather, I am persuaded that you had notice, from the time of your admission, that a student who is dropped because of unsatisfactory academic performance would have to persuade the Law School that the student's individual circumstances warranted an exception to the rule. You also had notice from the beginning about the Law School's time limits for completion of a course of studies once it is begun.

When the Retentions Committee first considered your appeal for readmission, it heard your explanation of alcoholism. In denying your appeal, it stated that it was requiring you to give "the necessary assurances that were you retained, you could perform as a regular functioning member of the law school class, able to take normal academic loads and complete them satisfactorily within the usual time" (letter to you from Professor Thain, dated September 14, 1982).

Your reason for the exception was your alcoholism and your expectation that you could control that abuse. Thus, the Law School committees tended to focus on this reason and your expectation when informing you of their deliberations and decisions. While this is a natural consequence of the arguments you made to these committees, I do not believe that the ultimate issue, as stated in Professor Thain's September 14, 1982, letter, was thereby changed. The Law School was

still entitled to consider all available information bearing on the likelihood of satisfactory performance if you were readmitted. It was therefore appropriate for it to consider your performance in the Business School. You brought these grades to the attention of the Retentions Committee because you believed they supported your position. The Committee, applying its judgment in view of the specific courses in question and the fact that you were not carrying the full academic load you would be expected to carry if readmitted to the Law School, concluded otherwise.

I therefore conclude that the Law School did not improperly change the criteria on which it based its decision not to readmit you.

It would be gratuitous of me to offer you personal advice in this situation, but I do hope that you will take advantage of the resources available in the community in order to make a wise decision about your future. If I can be of help in steering you to people who can be of assistance, please let me know.

On or about October 29, 1985, Anderson filed a Charge of Discrimination on the basis of handicap (alcoholism) with the Equal Rights Division for the Department of Industry, Labor and Human Relations for the State of Wisconsin. After conducting an investigation, Marilyn Kuick, as an investigator for the Equal Rights Division, found that there was probable cause to believe that the University of Wisconsin Law School had engaged in discrimination against Anderson on the basis of his handicap (alcoholism). Anderson filed his charge with the Equal Rights Division pursuant to Wis.Stat. § 101.223(1) which prohibits handicap discrimination in certain educational institutions. The division did not have jurisdiction to consider Anderson's charge of racial discrimination since the law school was not an employer but rather an educational institution.

On August 28, 1986, Anderson brought this handicap and race discrimination claim against the defendants in this Court. Anderson contended that the defendants discriminated against him on the basis of handicap and race when they denied his request to be readmitted into the University of Wisconsin Law School. Defendants have moved for summary judgment.

In support of their motion for summary judgment, the defendants have submitted the following facts and statistics which relate to the Retention Committee's actions on petitions. These facts and statistics are contested by plaintiff. However, plaintiff gives no reason for his objection.

During the period from 1979 through 1985, the Retentions Committee considered 57 requests to continue despite academic deficiency. Of these 57 requests, 39 were granted. Of the 39 requests granted, 29 of the petitions allowed to continue were of racial minorities. The Committee considered 19 petitions from blacks; 13 were granted and 6 were denied. The Committee considered 15 petitions from whites; 10 were granted and 5 denied.

Of the students who were allowed to continue despite their academic deficiency, 6 had an average above 76.92 and 33 had an average below 76.92. Of the students who were not allowed to continue because of their academic deficiency, 2 had an average above 76.92 and 13 had an average at or below 76.92.

The students who were allowed to continue despite their academic deficiency had an average of 76.4987; whites allowed to continue had an average of 77.527 and blacks allowed to continue had an average of 76.227. The students who were not allowed to continue despite their academic deficiency had an average of 74.1767; whites not allowed to continue had an average of 75.984 and blacks not allowed to continue had an average of 73.12.

During the same period, the Retentions Committee considered 16 requests for waiver of the time limitations imposed for attaining the degree. None of the students who were allowed a waiver of the time limit had an academically deficient grade average.

The plaintiff has submitted the following facts which relate to the Retentions Committee's actions on the petitions. Specifi-

cally, the plaintiff points to the fact that the Committee granted the petitions to continue despite academic deficiency of the following students: (1) S.C., Native American woman who had a 76.91 average and whose excuse was family problems; (2) R.E., a Hispanic woman who had a cumulative average of 76.84 and whose excuse was that she had problems which existed after her divorce; (3) C.G., a female student who had a 75.82 average and whose excuse for her average was that she was involved in too many non-academic programs which caused her average to drop; (4) S.J., a female student who had a 76.84 average and whose excuse was that she had difficulty undertaking law studies in her first semester of law school; (5) S.H., a black woman who had a 76.89 average and whose excuse was that she had difficulty in adjusting to law school because she had to share study time with her husband who was a third-year law student and child care time for her young son; (6) T.T., a black male who had an average of 76.38 and whose excuse was that his father was dying in the Surgical Intensive Care Unit at Rush-Presbyterian Hospital in Chicago during an examination; (7) P.R., a male student who had a 76.00 average and whose excuse was that he had suffered from kidney stones and intestinal infection and had returned to school too soon following surgery.

Plaintiff also pointed to the fact that the Committee granted the petition of J.P. to waive the five-year rule. J.P. was a white male student whose average was 77.42 and who had dropped out of law school because of psychiatric problems. The Retentions Committee required J.P. to submit written statements from his treating physicians that it was appropriate for him to return to law school as a full-time student. Once the Committee received this information, the Committee granted J.P.'s petition to waive the five year rule.

## OPINION

After examining the facts of this case, the Court determined that there were no genuine issues of material fact in this case, and that defendants' motion for summary judgment should be granted. The Court will now fully discuss the basis for its decision for each of plaintiff's claims.

*Section 504 of the Rehabilitation Act*

■ Plaintiff's first claim is a handicap discrimination claim under § 504 of the Rehabilitation Act, 29 U.S.C. § 794. 29 U.S.C. § 794 states as follows:

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

To state a claim based on § 504 of the Rehabilitation Act, plaintiff must prove (1) that he is a "handicapped person" under the Act; (2) that he is "otherwise qualified" for the position sought; (3) that he is being excluded from the position solely by reason of his handicap; and (4) that the position exists as part of a program or activity receiving federal financial assistance.

■ The first element that plaintiff must prove to state a § 504 claim is that he is a handicapped person under the Act. Plaintiff contends that he is a handicapped person under the Act because he is a recovered alcoholic. A recovered alcoholic is considered to be a handicapped individual within the meaning of the Rehabilitation Act. 29 U.S.C. § 706(7)(B); *Tinch v. Walters*, 765 F.2d 599, 603 (6th Cir.1985); *Sullivan v. City of Pittsburgh*, 811 F.2d 171, 182 (3rd Cir.1987). Accordingly, plaintiff has met the first element of his § 504 claim.

■ The second element that plaintiff must prove is that he is "otherwise qualified" for the position sought. A handicapped person is "otherwise qualified" if the handicapped person is able to meet all of a program's necessary requirements in spite of the handicap. *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). The regulations promulgated by the Department of Health, Education and Welfare more specifically state that a "qualified

handicapped person" is, "[w]ith respect to post-secondary and vocational education services, a handicapped person who meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity." 45 C.F.R. § 84.3(k)(3).

■ Plaintiff contends that he, as a recovered alcoholic, was able to meet the academic and technical standards required to continue in law school. The Court, however, believes that the uncontested facts show that plaintiff was not able to meet the academic standards required to continue in law school. To be qualified to continue in law school, a student must maintain a 77 average after the first complete year of law school. Plaintiff, however, failed to maintain this 77 average after his first complete year of law school. Since plaintiff was unable to meet the academic standards required to continue in law school, plaintiff was not otherwise qualified to continue in law school. *Schuler v. University of Minnesota*, 788 F.2d 510, 516 (8th Cir. 1986).

The Court recognizes that the law school makes exceptions to its rules and allows some academically unqualified students to continue in law school. The Court, however, believes that if the academic standards are rationally related to the law school's legitimate goals, then the law school has no obligation to make exceptions to those standards. The Supreme Court stated in *Southeastern Community College v. Davis*, 442 U.S. at 413, 99 S.Ct. at 2370, that "Section 504 imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person."

The Court finds that plaintiff was not academically qualified to continue in law school and that the law school had no obligation to make an exception and allow him to continue. Accordingly, plaintiff has failed to meet the second element of his § 504 Rehabilitation Act claim.

The third element that plaintiff must prove to state a § 504 claim is that he was excluded from the position solely by reason of his handicap. The Court believes that the uncontested facts show that the plaintiff was not allowed to continue in law school because he did not maintain a 77 average after his first year of law school.

Plaintiff contends that the reason the law school did not allow him to continue in law school despite his grades was solely because of his handicap. However, as stated above, the law school had no obligation to make an exception to its academic standards. Therefore, the reasons why the law school declined to make an exception for plaintiff is irrelevant for purposes of plaintiff's § 504 claim.

The Court finds that plaintiff was not excluded from law school solely by reason of his handicap. Accordingly, plaintiff has failed to meet the third element of his § 504 claim.

The fourth element that plaintiff must prove to state a § 504 claim is that the law school position existed as part of a program or activity receiving federal financial assistance. The Court will not address this element except to note that the parties disagree over whether this element has been met.

With regard to his § 504 claim, plaintiff has failed to make a showing sufficient to establish the existence of all four elements necessary to the claim. Specifically, plaintiff has failed to establish the existence of the second and third elements of his § 504 claim. Since plaintiff has failed to establish these elements, there can be no genuine issue as to any material fact. Accordingly, defendants' motion for summary judgment as to this claim must be granted.

*42 U.S.C. § 1983*

■ Plaintiff has alleged various claims based upon 42 U.S.C. § 1983. To state a cause of action based upon § 1983, plaintiff must prove (1) that the conduct complained of was committed by a person acting under color of state law; (2) that this conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States; and (3) that the defendants' acts were the proximate

cause of the injuries and damages sustained by the plaintiff.

The principal issues involved in plaintiff's § 1983 causes of action are whether defendants' conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States. Plaintiff contends that the defendants' conduct deprived him of (1) the right to be free from discrimination on the basis of handicap, which right is secured by § 504 of the Rehabilitation Act; (2) the right to be free from discrimination on the basis of handicap as guaranteed by the equal protection clause of the Fourteenth Amendment; (3) the right to be free from discrimination on the basis of race as guaranteed by the equal protection clause of the Fourteenth Amendment; (4) the right to substantive due process; and (5) the right to procedural due process. The Court will discuss each of these § 1983 causes of action separately.

*§ 1983 and § 504 of the Rehabilitation Act*

■ Plaintiff's first § 1983 action is based upon § 504 of the Rehabilitation Act. Plaintiff contends that defendants deprived him of the right to be free from handicap discrimination as that right is protected by § 504.

Plaintiff's contention must fail. Plaintiff cannot prove that he was deprived of the rights secured by § 504 because plaintiff cannot prove that he was "otherwise qualified" to continue in law school or that he was not allowed to continue in law school solely because of his handicap. Therefore, plaintiff's § 1983 action based upon § 504 must be dismissed.

*§ 1983 and Equal Protection for Handicapped Persons*

■ Plaintiff's second § 1983 action is based upon the equal protection clause of the Fourteenth Amendment. Plaintiff contends that defendants treat handicapped students differently than other students. More specifically, plaintiff contends that the U.W. Law School treated students who are alcoholics and who were expelled for academic reasons differently than other students who were expelled for academic

reasons when the students applied for readmission.

The Court believes that plaintiff's equal protection claim based on handicap discrimination must be dismissed. First, the Court believes that there is no evidence to indicate that the Law School has classified students with alcohol problems. Second, the Court believes that if students with alcohol problems are classified and are treated differently than other students in the readmission process, there is no evidence to indicate that such differential treatment is not rationally related to a legitimate state interest.

The Court believes that the Law School did not violate the equal protection clause because there is no evidence to indicate that it classified students with alcohol problems. The evidence indicates that the Law School treated each student applying for readmission individually. Such individualized treatment, even if based in part on factors such as handicap, is not prohibited by the equal protection clause. See, for example, *Regents of University of California v. Bakke,* 438 U.S. 265, 315–320, 98 S.Ct. 2733, 2761–2763, 57 L.Ed.2d 750 (1978).

The Law School and its committees, when examining the petitions for readmission, conduct an individualized review of each student and the reason for that student's academic failure to determine whether the student can subsequently succeed in Law School. Generally, each student petitioning for readmission presents a reason or excuse for failing to maintain the required grades and then attempts to convince the committees that the problems causing the failing grades have been solved. The nature of the problem necessarily dictates the manner of showing that the problem has been solved. After the student petitioning for readmission presents his or her reasons, the committees decide whether they believe that the student is likely to succeed in Law School despite his or her current academic problems.

Plaintiff, in petitioning for readmission, claimed that he failed to maintain the required grades because of alcoholism. Plaintiff then attempted to convince the committees that his alcoholism was under control and that he could succeed in Law School if readmitted. The committees, however, after considering plaintiff's alcoholism, his grades in both Law School and Business School, his first year Law School history with regard to dropping the second semester, and his alleged harassment of his legal writing partner, decided that they did not believe that plaintiff was likely to succeed in Law School despite his current academic problems.

The Court believes that the evidence clearly shows that each student applying for readmission, including plaintiff, was treated individually. Each student had to convince the Law School committees that he or she could succeed in Law School. The committees examined the individual factors of each student to determine whether they were convinced that the student could succeed in Law School.

Plaintiff has submitted no evidence to indicate that the Law School classified students with alcohol problems. Since there is no evidence of state classification, plaintiff cannot prevail on his § 1983 handicap discrimination claim.

If the Law School did classify students with alcohol problems and did treat these students differently than other students in the readmission process, the Court believes that such differential treatment did not violate the equal protection clause. A governmental classification which treats persons who are alcoholics or recovering alcoholics differently than other persons is examined under the rational basis standard. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 3254–58, 87 L.Ed.2d 313 (1985); *Upshur v. Love*, 474 F.Supp. 332, 337 (N.D.Cal.1979). Under the rational basis standard, the general rule is that governmental action is presumed to be valid and will be sustained if the classification drawn is rationally related to a legitimate state interest. *Cleburne*, 105 S.Ct. at 3254.

The Law School has an interest in graduating competent attorneys. In order to make sure that graduating students are competent, the Law School has required that students maintain a 77 average to continue in Law School. If a student does not maintain a 77 average, he or she is expelled. A student who has been expelled because of academic failure may petition the Retentions Committee to be readmitted. The Committee expects the petitioner to provide a reason for the academic failure, and further expects the student to show that the reason for the failure has sufficiently abated to warrant optimism for future Law School work. If a student asserts that alcoholism is the reason for academic failure, that student must show that the effects of the alcoholism have abated sufficiently to warrant optimism for the future.

Plaintiff contends that students who are alcoholics are required to convince the Law School committees that they can succeed in Law School to a greater degree of certainty than are other students. In support of his contention, plaintiff cites the committees' favorable treatment of other students' petitions. In those cases the committees accepted the students' contentions that the problems causing their academic failure had been solved and that they would be able to succeed in Law School. Plaintiff apparently contends that the reasons and explanations given by the other students were less compelling and convincing than his own reasons.

Assuming that plaintiff's contention that students who are alcoholics are treated differently by the Retentions Committee is true, the Court believes that such differential treatment is rationally related to the Law School's legitimate interests in graduating competent attorneys. A law student who is academically deficient because of his or her alcoholism must convince the Law School committees to a greater degree of certainty that he or she has solved the alcohol problem and will be able to succeed in Law School in the future. This greater burden is rational because it is not unreasonable to believe that a student with a

permanent problem such as alcoholism is less likely to solve his or her problem than is a student with a more temporary problem, as exemplified by the comparisons offered by plaintiff.

The plaintiff has submitted no evidence or arguments to indicate that the Law School's differential treatment of students with alcohol problems, if any, is not rationally related to a legitimate state interest. In the absence of such evidence, plaintiff cannot prevail on his § 1983 handicap discrimination claim.

*Section 1983 and Equal Protection for Black Persons*

Plaintiff's third § 1983 action is also based upon the equal protection clause of the Fourteenth Amendment. In this cause of action plaintiff contends that the Law School denied his petition for readmission because he is black.

■ In order to state a race discrimination claim under § 1983, plaintiff must prove that the defendants intended to discriminate against blacks. *Washington v. Davis,* 426 U.S. 229, 238–39, 96 S.Ct. 2040, 2046–47, 48 L.Ed.2d 597 (1976); *General Building Contractors Association v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). Plaintiff may prove intentional or purposeful discrimination by either direct or indirect evidence.

■ Plaintiff has submitted the following evidence to prove racial discrimination. First, plaintiff points to a May 3, 1984 memorandum from Professor Kidwell to Professor Irish, which stated:

Mr. Anderson was in my Contracts I class in the fall of 1980. It was a large class and met in Room B–25, if I recall. Mr. Anderson sat in the front of the room. At the beginning of the semester he frequently volunteered in class; I was encouraged by this since it had been my experience that minority students often fail to participate in class discussions.

Plaintiff contends that this memo indicates that his race was a consideration in the committees' decision-making process.

Plaintiff also points to the committees' decision to grant the petition of J.P., a white male with a psychiatric disability. J.P. had a 77.42 Law School average. J.P. requested a waiver of the five-year rule. When considering the petition, the Retentions Committee required J.P. to submit written statements from his treating physicians to the effect that he could return to Law School as a full-time student. Once the Committee received this information, it granted J.P.'s petition to waive the five-year rule. Plaintiff contends that the Committee's favorable treatment of J.P. in comparison with his own unfavorable treatment indicates that plaintiff was treated differently because of his race.

Plaintiff contends that the evidence presented by him raises a genuine issue of material fact regarding whether defendants intentionally or purposefully discriminated against him on the basis of race. The Court, however, cannot accept plaintiff's contention. The memo from Kidwell to Irish in no way indicates that defendants intentionally or purposefully discriminated against the plaintiff on the basis of race. Similarly, the comparison with plaintiff does not raise a genuine issue. Comparing the treatment of the petitions of J.P. and plaintiff is like comparing apples with oranges. J.P. was seeking a waiver of the five-year rule. Plaintiff was seeking to be readmitted to Law School after being expelled. The considerations involved in examining these two petitions are different. Therefore, the treatment of J.P. in comparison to the treatment of plaintiff provides no evidence of intentional or purposeful discrimination.

Plaintiff has put forth no evidence that would raise a genuine issue of material fact as to whether the defendants intentionally or purposefully discriminated against the plaintiff on the basis of race. Since there is no evidence of intentional discrimination, plaintiff cannot prevail on his § 1983 race discrimination claim. Accordingly, the Court holds that summary judgment on the race discrimination claim is appropriate.

*Section 1983 and Substantive Due Process*

Plaintiff's fourth § 1983 claim is based on the due process clause of the Four-

teenth Amendment. Plaintiff contends that he has a property interest in his continued legal education and that the denial of his petition to continue in Law School was arbitrary and capricious, violating his substantive due process rights.

The Court believes that plaintiff's substantive due process claim must fail for two reasons. First, plaintiff has submitted no evidence or authority to support his contention that he has a property interest in being readmitted to Law School after being expelled for failing to maintain the required grade average. Second, plaintiff has submitted no evidence to suggest that the Law School's decision to deny his petition to continue in Law School was arbitrary and capricious.

 In order to maintain a substantive due process claim, plaintiff must prove that he has a property interest that is protected by the due process clause. The property interests protected must be "defined by existing rules or understandings that stem from an independent source such as state law," *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

Plaintiff contends that he possesses a property interest in his continuing education since he has begun a course of study in Law School. Plaintiff points out that courts have recognized a property interest in continuing education once a student has begun a course of study. *Martin v. Helstad,* 578 F.Supp. 1473, 1480 (W.D.Wis. 1983). The Court does not argue with the plaintiff's contention that a student has a property interest in continuing education once the student has begun a course of study. However, the Court believes that plaintiff's contention misses the point.

 The issue in this case is whether a student who is expelled from school for failing to maintain a required grade average has a property interest in being readmitted to school. Plaintiff has submitted no state statute, university rule, or any other basis that would suggest that a student who is expelled from school for failing to maintain a required grade average has a property interest in a continuing education.

Absent such a showing, the Court finds that plaintiff has failed to show that he has a property interest in being readmitted to Law School. Since plaintiff has failed to show that he has a property interest in being readmitted, plaintiff has failed to raise a genuine issue of material fact with regard to his § 1983 substantive due process claim.

If the Court assumes that plaintiff does have a property interest in being readmitted to Law School, plaintiff then must prove that the decision to deny his petition to be readmitted was arbitrary and capricious. Plaintiff contends that the decision was arbitrary and capricious because the committees held plaintiff to a higher burden of proof than they held other petitioners who petitioned to be readmitted to Law School.

In determining whether the Law School committees acted arbitrarily in denying plaintiff's petition for readmittance, the Court must examine the Law School's actions with substantial deference. The Supreme Court, in *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985), stated that:

> When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

In this case plaintiff has not offered any evidence which would suggest that the committees' decisions to deny plaintiff's petitions for readmission were a substantial departure from accepted academic norms as to demonstrate that the committees did not exercise professional judgment. To the contrary, the record shows that the committees thoroughly examined plaintiff's case and had numerous reasons to deny plaintiff's petitions. These reasons included plaintiff's grades in Law School and Business School, his prior history of drop-

ping the second semester of his first year of Law School, his alcoholism, and his alleged harassment of his legal writing partner. The record does not show that the committees failed to use their professional judgment.

Given the lack of evidence to support plaintiff's contention that the committees' decisions to deny plaintiff's petitions for readmission were arbitrary and capricious, the Court finds that plaintiff has failed to raise a genuine issue of material fact with regard to his § 1983 substantive due process claim. Accordingly, summary judgment on this claim is appropriate.

*Section 1983 and Procedural Due Process*

Plaintiff's fifth and final § 1983 claim is also based on the due process clause of the Fourteenth Amendment. Plaintiff contends that he has a property interest in his continued legal education and that the Law School committees' actions denied him his property right without procedural due process.

The Court believes that plaintiff's procedural due process claim must fail for two reasons. First, as stated before, plaintiff has submitted no evidence or authority to support his contention that he has a property interest in being readmitted to Law School after being expelled for failing to maintain the required grade average. The Court will not discuss this issue again. Second, plaintiff has submitted no evidence to suggest that the Law School denied him the procedural due process to which he was entitled.

If the Court assumes that plaintiff does have a property interest in being readmitted to Law School, plaintiff then must prove that the Law School denied him the procedural due process to which he was entitled. Plaintiff contends that the Law School violated his procedural due process rights because the Petitions Committee ignored his discrimination complaint and instead conducted a *de novo* review to determine whether his petition should have been granted. In conducting the *de novo* review, plaintiff alleges that the Petitions Committee simply secured negative information regarding him without providing him an opportunity to rebut that information.

■ The Court, however, cannot agree with the plaintiff's contention that the Law School violated his procedural due process rights. The full procedural safeguards of the Fourteenth Amendment are inapplicable where a student is dismissed from or denied readmittance to a state educational institution because of failure to meet academic standards. "Dismissal of a student for academic reasons comports with the requirements of procedural due process if the student had prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal, and if the decision to dismiss the student was careful and deliberate." *Schuler v. University of Minnesota*, 788 F.2d 510, 514 (8th Cir.1986) (citing *Board of Curators v. Horowitz*, 435 U.S. 78, 85–86, 98 S.Ct. 948, 952–53, 55 L.Ed.2d 124 (1978)).

■ Plaintiff in this case was informed of his grade deficiency and his expulsion for academic failure. He was informed of his right to petition the Law School Retentions Committee for permission to be readmitted despite his academic failure. Plaintiff petitioned the Retentions Committee for permission to continue in Law School three times. He was allowed to submit written materials and witnesses in support of his petition. The Retentions Committee denied plaintiff's petitions. Plaintiff appealed the Retentions Committee's decision; plaintiff claimed that the Retentions Committee discriminated against him on the basis of handicap. The Petitions Committee examined plaintiff's petition again and determined that he could not succeed in Law School. The plaintiff appealed the decision to the Chancellor. The Chancellor affirmed the decision.

The Court believes that the procedures afforded to the plaintiff exceeded the constitutionally required due process to which plaintiff was entitled. Given that the procedures afforded exceeded the constitutionally required procedures to which plaintiff was entitled, the Law School's noncompliance, if any, with its own procedures is not

a violation of procedural due process. *Schuler v. University of Minnesota,* 788 F.2d at 515.

Plaintiff has failed to submit any evidence or argument to suggest that the Law School violated his rights to procedural due process. Given this failure, plaintiff cannot state a § 1983 procedural due process claim. Summary judgment is therefore appropriate.

*Section 1981*

Plaintiff's final claim is a race discrimination claim under 42 U.S.C. § 1981. This claim is based upon the same allegations as the § 1983 race discrimination claim, and must fail for the same reason. Plaintiff has submitted no evidence to indicate that the defendants had the intent to discriminate against him on the basis of race. Since plaintiff has failed to introduce any evidence of intent to discriminate, no genuine issue of material fact exists with regard to plaintiff's § 1981 claim. Summary judgment on this claim is therefore also granted.

### ORDER

IT IS ORDERED that defendants' motion for summary judgment is GRANTED and plaintiff's complaint is DISMISSED with prejudice.

IT IS FURTHER ORDERED that judgment is entered in favor of the defendants, against the plaintiff, DISMISSING his complaint with prejudice and costs.

Let judgment be entered accordingly.